EXHIBIT A

Walter T. Keane – 10333
**WALTER T. KEANE, P.C.**
2825 Cottonwood Pkwy., Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 990-4422
Facsimile: (801) 606-7533
Email: walter@walterTkeane.com
*For plaintiff*

### IN THE FIFTH JUDICIAL DISTRICT
### IN AND FOR WASHINGTON COUNTY, STATE OF UTAH

| | |
|---|---|
| **800 NRP, LLC,**<br>Plaintiff,<br><br>-vs-<br><br>**NEVADA STATE BANK, DOES 1-25, UNKNOWN PARTIES OF INTEREST,**<br><br>Defendants. | **COMPLAINT**<br><br>Case No: 100502594<br><br>Judge: Shumate |

Plaintiff complains as follows:

### Introduction

Plaintiff is a site-specific ownership entity for property located in Hurricane, Utah. Nevada State Bank lent substantial funds towards the development of the property. The bank is in default under the financing agreement. Plaintiff might be in technical breach of the contract.

1

However, Nevada State Bank has not only failed to mitigate damages, but has actively undermined the leasing and sales of units within the development. Plaintiffs bring this litigation in large part to counter plaintiff's failure to mitigate.

"The law does not permit the [Nevada State Bank] to recover those damages that could have been avoided without undue risk, burden or humiliation." *See* 11 Joseph M. Perillo, *Corbin on Contracts* §57.11 (rev. ed. 2005). Nevada State Bank needs to work with plaintiff to sell and lease the property. The value of the property sold (and/or leased out) would be far greater if Nevada State Bank would act reasonably.

Members of the plaintiff have executed personal guarantees should plaintiff fail to pay the debt. Ironically, an incentive exists for the bank to take steps to decrease the market value of the property and therefore increase the potential deficiency judgment against plaintiff. *See* UTAH CODE ANN. §57-1-32. Additionally, it would increase the potential judgment on the guarantors. Without this Court's intervention the bank will enjoy an unjust windfall.

### Parties

1. Defendant, Nevada State Bank is a banking institution.

2. Plaintiff 800 NRP, LLC, is a limited liability company which is the site-specific ownership entity for the property.

> **Plaintiff acknowledges it may have made a technical default under the loan agreement; yet, the bank has blocked plaintiff's significant efforts to mitigate damages.**

2

3. Plaintiff acknowledges that a reasonable person could argue it was in technical default of the loan terms.

4. However, plaintiff has made significant efforts to mitigate damages and avoid litigation. For example:

   a. Plaintiff made good faith efforts to merely meet with bank personnel but was refused for about a year;

   b. Plaintiff hired an expert to restructure the debt obligations to the benefit of all parties, this expert tendered several proposals to the bank as workout solutions but the bank provides no meaningful response;

   c. Plaintiff obtained offers on units within phase one, however, the bank blocked the sales and stigmatize the property in the eyes of the market;

   d. Plaintiff sought to lease out portions of the property, yet the bank to this day refuses to release $70,000 plaintiff's own funds (taken for phase three construction) so as to offer phase one and two potential tenants their customary "tenant improvements"; and,

   e. Plaintiff, before filing this complaint, submitted a copy to bank personnel and requested a meeting and/or initial discovery so as to save on litigation costs and hopefully resolve any concerns about fraud on the part of Lancaster.

5. The obstruction of sales and failure to mitigate damages on the part of the bank will result in increased damages to all parties.

6. The public at large has been and will be negatively affected by the bank's blunders and/or malfeasance in failing to take reasonable steps to mitigate damages.

7. The bank has failed to mitigate damages appropriately and plaintiff must not be held liable for the bank's mismanagement.

## Background

8. Plaintiff is a site-specific ownership entity for approximately six acres of unimproved industrial "flex space" located in Quail Creek Industrial Park Hurricane, Utah.

9. Plaintiff secured an initial commitment for a loan based upon a $10 million appraisal of the property.

10. The bank objected to the $10 million valuation based upon an appraisal review.

11. Lancaster, a bank official, acknowledged that the bank's appraisal review was flawed but citing bank policy he refused to do anything about it.

12. The bank's lower estimate of value resulted in the plaintiff being short of funds necessary to develop property.

13. This budget shortfall was discussed with Lancaster.

14. The bank, Lancaster and plaintiff agreed that the first two phases of the development project would occur.

15. The bank, Lancaster and the plaintiff further agreed that the issue of financing the third phase would be tabled until a later time.

16. Lancaster specifically stated to principals of the plaintiff that the funding for the development of phase three would all work out after the completion of phases one and two.

17. Lancaster stated that the bank would work with plaintiff sell and/or lease phases one and two as necessary in order to later fund phase three.

18. In consideration of this financial shortfall, the bank, Lancaster and plaintiff agreed that the first two phases of the development project would occur.

**Lancaster and his three solutions for the phase 3 shortfall.**

19. Lancaster pointed to at least three solutions regarding the impending phase three shortfall:

   a. since a commercial town house map was recorded for the sales of units, the bank could retain the profits from the sales and retain them in an account to be used for construction of the third phase;

   b. alternatively, the bank could order an appraisal after the second phase was finished and after a determination of the equity, fund additional monies for the construction of the third phase; or,

   c. finally, Lancaster proposed obtaining permanent conventional financing for the buildings as they were leased out and then obtain temporary construction funding for phase three.

20. However, in direct contradiction to the promises and agreements Lancaster and the bank later demanded $400,000 cash payment attributable to phase 3.

21. Today, approximately $70,000 of that $400,000 cash payment remains; yet, the bank won't release it even though that money could mitigate damages significantly as described below.

### The bank and Lancaster thwart the sale of building one by requiring contributions to phase three.

22. Plaintiff tendered contracts to purchase two units from third-party buyers within phase one to the bank.

23. Additionally, plaintiff had received a letter of intent from clients of NAI brokerage for an additional three units; all contingencies in the letter of intent were satisfied.

24. The third-party buyers stood ready to close the sale of the two units.

25. Plaintiff requested that the bank to remove its encumbrance upon that portion of the project so as to transfer clear title via warranty deed to the third-party buyers.

26. The bank refused.

27. Rather than allow the sales proceed, the bank demanded additional $100,000 cash over and above the gross sale prices for each of the units (there are five units in building one so plaintiff would need to raise $500,000 above the total gross sale price for building one) in order to transfer clear title to third party buyers.

28. Plaintiff pointed out to the bank that the entire purpose and function of the plaintiff was to develop the property and sell or lease the units at a profit.

29. Considering that building one was fully developed – with an offer pending for two units and a letters of intent for the remain units – the plaintiff essentially mutated from a developer to a seller in regards to building one.

30. In other words, the plaintiff only expends money for development . . . it then receives money for sale or lease of the property to third parties; this is basic capitalism.

31. Contrary to this straightforward paradigm, the bank wanted the plaintiff to pay $500,000 to close sales which would result in the mitigation of damages.

32. The plaintiff also pointed out to the bank that it was acting in direct contradiction to the "three phase 3 shortfall solutions" agreed to buy Lancaster.

33. The bank's building one $500,000 "above-gross-sale-price" demand was learned of by local real estate licensees, potential purchasers, potential renters and others (collectively "the market").

34. The market – witnessing the $500,000 cash call by the bank for an unrelated phase of the development – now believes that the project is stigmatized because the bank is so unreasonable in this regard.

35. The market knows that an unreasonable lender will undermine and even destroy the greatest potential for any project.

36. Further, the market reasoned that all working capital of the plaintiff was taken by the bank and so no tenant improvements or other amenities would be available and, therefore, seeking tenancy at the project would be futile.

37. The bank has done nothing to disabuse the market of this stigmatization.

### The bank and Lancaster mismanage and/or intentionally withhold critical financing.

38. The bank refused to disperse funds necessary to complete the project pursuant to the agreement between the parties.

39. Generally the market demands that owners, such as plaintiff, provide tenant improvements the cost of which is primarily borne by the owner.

40. As noted above, the bank has approximately $70,000 of plaintiff's money remaining in an account.

41. Considering the banks obstruction of building one sales, plaintiff is in desperate need of that money to offer tenant improvements for phase one and phase two buildings.

42. Allowing the plaintiff access to its own $70,000 to offer tenant improvements will dramatically increase the likelihood of plaintiff to attract and retain tenants and increase the market value of the property.

43. The bank will not acknowledge the obvious commercial reality tenant improvements are customary and necessary to lease the property out and create cash flow.

44. Ironically, the lower the market value of the project the higher the potential deficiency judgment against the plaintiff and the higher the judgments against the guarantors.

45. The bank, free to exercise which ever remedy it chooses, has an economic incentive to drive the value of the property down in the four months leading up to a trustee's sale.

46. Thereafter, the bank can pursue the plaintiff for the deficiency and also seek judgments based on the personal guarantees of some of the members of the plaintiff.

47. The bank will take title to the property, remove this stigmatization it created, and then sell and/or lease as it deems appropriate and enjoy an unjust windfall.

**Plaintiff obtains the services of an independent banker in an effort to work out a solution and mitigate damages for all involved.**

48. Plaintiff retained the services of Waterstone Loan Services, a banking consultancy firm specializing in re-modification of commercial loans.

49. Waterstone mailed a letter to the bank pointing out the necessity of allowing plaintiff to offer potential tenants customary tenant improvements and/or tenant build outs at the plaintiff's expense.

50. Without the "tenant build out" potential tenants were being lost to other developments in the area.

51. According to Waterstone, plaintiff would need the $70,000 currently held by the bank to perform tenant build outs.

52. The bank again has refused to act to mitigate damages.

53. With no other choice plaintiff retained counsel and proceeded with the present litigation.

### First cause of action
### Breach of contract against.

54. Plaintiff incorporates all preceding paragraphs into this cause of action.

55. A contract exists.

56. The bank is in breach of the contract.

57. Plaintiff may be in breach.

58. The bank breached the implied covenant of good faith and fair dealing which is in fact a breach of the contract.

59. No provision exists within the loan documents whereby plaintiffs expressly waived the requirement that bank engaged in loss avoidance strategies and/or mitigate damages.

60. The bank has refused to mitigate its damages causing wrongful injury to plaintiff and de-valued the property.

61. Plaintiff has been damaged thereby in an amount to be determined at hearing or trial but currently estimated at $10 million.

### Second cause of action
### Breach of the implied covenant of good faith and fair dealing.

62. Plaintiff incorporates all preceding paragraphs into this cause of action.

63. Inherent in the contract at issue in this case is the implied covenant of good faith and fair dealing.

64. Reasonable people standing in the position of the bank and plaintiff, knowing now what they didn't know then regarding the economy, would have memorialize additional good-faith terms within the construction agreement and/or trust deed.

65. For example, reasonable people would've required a provision whereby the bank would be required to allow plaintiff to access its $70,000 currently held by the bank for tenant improvements... If those tenant improvements would increase the cash flow the project and in turn increase the value of the property.

66. Additionally, reasonable people would've required the bank to move forward with phase one unit sales regardless of any outstanding debt obligations of plaintiff; this is basic mitigation of damages and loss avoidance.

67. Finally, reasonable people would've required a provision whereby the bank and the plaintiff would meet in an effort to acknowledge the market and proceed practically and avoid damages.

68. The bank breached the implied covenant of good faith and fair dealing.

### Third cause of action
### Unjust Enrichment against the bank.

69. Plaintiff incorporates all preceding paragraphs into this cause of action.

70. Rather than work with the plaintiff in an effort to mitigate damages by selling units in a commercially reasonable fashion, the bank intends to foreclose on the property.

71. Considering the bank's mismanagement and failure to mitigate damages the current market value of the project has been reduced by approximately $15 million.

72.     It would be unjust for the bank to be enriched with title to a property, the market value of which has been reduced by the own misfeasance, malfeasance or nonfeasance.

73.     The bank will move forward with the foreclosure of the property.

74.     The bank will move forward with the marketing and sale of the units or sell the entire development to any purchaser with eyes to see its enormous potential.

75.     The bank will seek a deficiency judgment against the plaintiff.

76.     The bank will seek judgments against the individual members pursuant to personal guarantees.

77.     The bank then would appreciate and have knowledge of two great benefits: the ownership of the project, a deficiency judgment against the plaintiff and judgments against the guarantors.

78.     It would be inequitable under these circumstances for the bank to retain these benefits.

## Fourth cause of action
### Request for imposition of Constructive Trust over the property.

79.     Plaintiff incorporates all preceding paragraphs into this cause of action.

80.     Plaintiff respectfully calls upon this Court to impose a constructive trust over the property.

81.     Alternatively, plaintiff respectfully calls upon this Court to impose a constructive trust over the proceeds of any trustee's sale for any portion of the subject property.

82. In this way, a determination can be made as to the adequacy of the bank's efforts at mitigation and loss avoidance.

### Prayer for relief

Plaintiff seeks attorney's fees, compensatory damages, punitive damages pursuant to the contracts and statutes at issue in this case. Plaintiffs also seek such other rulings in and determinations as this Court deems necessary.

DATED this **28th** day of July 2010.

Walter T. Keane, P. C.

_____
BY: Walter T. Keane

```
                      FIFTH DISTRICT COURT-ST GEORGE
                      WASHINGTON COUNTY, STATE OF UTAH

                      800 NRP LLC vs.  NEVADA STATE BANK

CASE NUMBER 100502594 Contracts
_____


CURRENT ASSIGNED JUDGE
        JAMES L SHUMATE

PARTIES

        Plaintiff -  800 NRP LLC
        Represented by: WALTER T KEANE

        Defendant -  NEVADA STATE BANK

ACCOUNT SUMMARY

        TOTAL REVENUE   Amount Due:         373.25
                        Amount Paid:        373.25
                             Credit:          0.00
                            Balance:          0.00



        REVENUE DETAIL - TYPE: COMPLAINT 10K-MORE
                        Amount Due:         360.00
                        Amount Paid:        360.00
                     Amount Credit:           0.00
                            Balance:          0.00

        REVENUE DETAIL - TYPE: TELEPHONE/FAX CHARGE
                        Amount Due:           7.00
                        Amount Paid:          7.00
                     Amount Credit:           0.00
                            Balance:          0.00

        REVENUE DETAIL - TYPE: COPY FEE
                        Amount Due:           6.25
                        Amount Paid:          6.25
                     Amount Credit:           0.00
                            Balance:          0.00

CASE NOTE


PROCEEDINGS

07-29-10 Case filed
```

```
Printed: 09/27/10 13:57:05          Page 1

CASE NUMBER 100502594 Contracts
_____

07-29-10 Judge JAMES L SHUMATE assigned.
07-29-10 Filed: Complaint 10K-MORE
07-29-10 Fee Account created      Total Due:         360.00
07-29-10 COMPLAINT 10K-MORE       Payment Received:         360.00
         Note: Code Description: COMPLAINT 10K-MORE
08-03-10 Fee Account created      Total Due:           7.00
08-03-10 TELEPHONE/FAX CHARGE     Payment Received:           7.00
08-03-10 Note: Faxed copy of complaint to Karen at Ballard Spahr this
         date
08-18-10 Fee Account created      Total Due:           6.25
08-18-10 COPY FEE                 Payment Received:           6.25
         Note: COPY FEE, 10.25 cash tendered.          4.00 change
         given.




Printed: 09/27/10 13:57:05          Page 2 (last)
```